Booth, Judge,
delivered the opinion of the court:
The plaintiff, the Pittsburgh & West Virginia Railway Company, and its subsidiary, the West Side Belt Railroad Co., seek in the petition the recovery of $21,295.62 paid as the 2 per cent normal tax on the consolidated report of its income for the calendar year 1921. One item entering into the net taxable income of the plaintiff was $1,064,781.39 paid to it in accord with a written contract of settlement entered into by the plaintiff and the Railroad Administration as just compensation for the use of its railroads during the period of Federal control.
The facts, which are not in dispute, are as follows: From January 1, 1918, to February 29, 1920, the whole period of Federal control the railroads involved were in the possession, control, and operation of the Government. The Federal control act of March 21, 1918, 40 Stat. 451, sec. 1, contained the following provision:
“Any Federal taxes under the act of October 8, 1917, or acts in addition thereto or in amendment thereof, commonly called war taxes, assessed for the period of Federal control beginning January 1, 1918, or any part of such period, shall *18 be paid by the carrier out of its own funds, or shall be charged against or deducted from the just compensation; that other taxes assessed under Federal or any other governmental authority for the period of Federal control or any part thereof, either on the property used under such Federal control or on the right to operate as a carrier, or on the revenues or any part thereof derived from operation * * * shall be paid out of the revenues derived from railway operations while under Federal control * *
The act of September 8, 1916, 39 Stat. 756, imposed an income tax of 2 per cent upon the entire net income of every corporation received from all sources. The war coming on, the revenue act increased the tax to 4 per cent by the act of October 3, 1917, 40 Stat. 300, and again by the act of February 24, 1919, 40 Stat. 1057, called the revenue act of 1918, war taxes of much higher rates were imposed by the following provisions, in section 230, paragraphs (a) and (b) :
“ That in lieu of the taxes imposed by section 10 of the revenue act of 1916, as amended by the revenue act of 1917, and by the section 4 of the i’evenue act of 1917, there shall be levied, collected, and paid for each taxable year upon the net income of every corporation a tax at the following rates: (1) For the calendar year 1918, 12 per centum of the amount of the net income in excess of the credits provided in section 236; and (2) for each calendar year thereafter, 10 per centum of such excess amount.
“For the purposes of the act approved March 21, 1918, entitled ‘ An Act to provide for the operation of transportation systems while under Federal control, for the just compensation of their owners, and for other purposes,’ five-sixths of the tax imposed by paragraph (1) of subdivision (a) and four-fifths of the tax imposed by paragraph (2) of subdivision (a) shall be treated as levied by an act in amendment of Title I of the revenue act of 1917.”
The plaintiff, early in the year 1917, had undergone a reorganization of its corporate affairs, and this fact gave rise to a contention that its operating income for the three years preceding June 30, 1917 — the test period established by the statute as a basis for fixing just compensation to the railroads taken over by the Government — did not reflect or furnish a reliable guide for the adjustment of compensation due for the use of its properties. At any rate, during the whole period of Federal control, notwithstanding the report of *19 the Interstate Commerce Commission filed January 16, 1919, disclosing the plaintiff’s average annual operating income for the test period above mentioned, the plaintiff and the Sailroad Administration were absolutely unable to agree upon the amount of just compensation due the plaintiff until July 1, 1921. So that as to the entire period of Federal control the plaintiff did not receive from the Government any sum for the use of its properties, except an advancement made by the Sailroad Administration in January of 1920 of $250,000, and upon that sum, as well as other items of independent income, the Sailroad Administration for the years involved, paid the 2 per cent normal income tax due from the plaintiff to the Government. The plaintiff, under the terms of the agreement of July 1, 1921, was awarded the sum of $1,800,000 as just compensation. It actually received in cash after the adjustment of prior claims and payments, the sum of $1,570,000. In making its income-tax returns for the year, it was allowed certain deductions, being finally compelled to pay an income tax on $1,061,781.39 as accrued in the year 1921, the Internal Kevenue Bureau first holding that the income assessed accrued during the period of Federal control, this ruling being reversed by the committee of appeals and review, holding the same as income for the taxable year 1921.
The defendant, in its contention, does not seek to escape or disavow liability for the payment of the 2 per cent normal income tax assessed against the plaintiff’s income for the taxable years 1918, 1919, and two months of 1920, and as a matter of fact the defendant paid the same. Defense is now made to liability for the tax upon the sole and single basis that there existe no statutory obligation to pay the tax involved upon the income of the plaintiff for the year 1921, a period subsequent to Federal control, when the properties themselves had been returned to the plaintiff and were being operated independently of the Railroad Administration. The argument is supported almost wholly upon the fact of plaintiff’s insistence before the Internal Revenue Bureau that the sum received from the defendant in 1921 was income for the year 1921. We are not primarily concerned with *20 what the Bureau of Internal Bevenue did with reference to the time when income accrued for income taxation. The question of liability of the plaintiff for the payment of war taxes is not now before us. Our concern with respect to the present issue is, Who is liable for the payment of the tax,, and what correlative rights and liabilities generated from the acts of Congress authorizing the taking over of the railroads in this respect? If the statutes governing the subject imposed upon the Government the legal obligation to pay during the period of Federal control the taxes, other than war taxes, assessed against the plaintiff’s income for that period, or assessed upon the revenues or any part thereof derived from operation, it would seem in reason and authority, the liability does not cease because the extent of the obligation was not fixed until after the period of control expired. It is no less a legal obligation though delayed in its discharge.
The just compensation paid to the plaintiff in 1921 was not income earned by the railroads by their independent operation during the year 1921. It was from funds accruing to the Government during its control and operation of the railroads, income from the operation of the plaintiff’s railroads earned by the defendant while under the management and operation of the defendant. The defendant would, in accord with its construction of the law, have paid the two per cent normal tax ultimately assessed against this sum if the same, like the $250,000 advanced and deducted therefrom, had been paid during the period of Federal control. The $250,000 advancement was a recognition of liability and obviously an admission that an indeterminate sum was then due the plaintiff, which, under the circumstances, was not then ascertainable, but which would subsequently be fixed and paid. This is exactly what was done.
Section 1 of the Federal control act, heretofore cited, authorized the President to “ agree ” with and “ to guarantee ” the railroads making operating returns to the Interstate Commerce Commission a sum equivalent, or as near thereto as may be, to its average annual operating income for the three-year test period, as just compensation for the use of its road. The second paragraph of this statute, in *21 language quite too plain to be misunderstood, expresses and assures the railroads another guaranty, a positive assurance that the railroads willing to so agree shall be entitled to receive the sum guaranteed as just compensation undiminished and in nowise depleted by the assessment or payment of any Federal taxes accruing during the period of Federal ■control, except war taxes. Surely this language can have no other meaning and intent: “ Other than taxes assessed under Federal or any other governmental authority for the period of Federal control, or any part thereof, either on the property used under such Federal control, or on the right to ■operate as a carrier, or on the revenues, or any part thereof, ■derived from operation * *
This was not the single inducement to encourage amicable ■settlements as to just compensation. On the contrary, the President was empowered to make certain advance payments of the same to the railroads with or without such an ¡agreement. Such was the character of the $250,000 paid to "this plaintiff in 1919, and upon which the Government paid the 2 per cent income tax assessed against the same. As a matter of fact the entire statute, from beginning to end, clearly reflects a legislative intent to relieve the railroads from the payment of any Federal taxes, except war taxes, during the time the income from their properties became the property of the Government, and was as to railroads charged with no other burden except the payment of just compensation for the use of the property taken over. The legislation was an indisputable recognition of the constitutional rights of the railroads to receive just compensation, and .afforded each of the parties an immediate and complete nemedy and opportunity to bring the issue to a permanent ■end.
Section 10 of the original Federal control act, 40 Stat. 451, ■declares the absolute ownership of the Government of all -the income derived from the operation of the railroads by the Government. Manifestly, the Government was to pay no income tax thereon, and the railroads, of course, in the meantime, received no income from this source, except the payment of just compensation. Having, therefore, lost their properties for the time being, and likewise lost their oper *22 ating income, the Government assumed the very just obligation of reimbursing the incident loss by making the com- . panies, as near as may be, whole by paying to them a sum ascertainable in the way prescribed, ánd free and unincum-bered by obligations to the payee as to Federal taxes not in their nature war taxes. Congress approved this policy. The act of March 21, 1918, cited above, imposed upon the carriers the payment of any Federal taxes accruing under the ' act of October 3, 1917, or acts in addition thereto or in amendment thereof, commonly called war taxes, assessed for the period of Federal control beginning January 1, 1918, or any part of such period. Obviously, we need but mention the fact that the original revenue act imposing income taxes was in no sense a war measure. The increase of rates due to war conditions subsequently impressed the legislation with this character, and Congress, by the act of February 24, 1919, 40 Stat. 1057, in section 230, marked out with precision the line of demarcation between peace and war time rates by providing with reference to the operation of the railroads taken over by the Government that only five-sixths and four-fifths, respectively, of the vast increase in income-tax rates should be treated as levied by an act in amendment of Title I of the revenue act of 1917, a most positive and pronounced recognition of the rights of the railroads with respect to income taxes accruing under the act of October 3, 1917, and the liability of the Government for the payment of all Federal taxes due from the railroads to the Government during the period of Federal control, except as therein mentioned. If the impossibility of recourse to other factors in this case existed, this legislation, we feel certain, is sufficient in itself to confirm beyond peradventure the opinion of the court that the Government beyond question assumed and guaranteed to the railroads operated during Federal control that the compensation to be paid them as just- for the use of their properties, would be a sum free and undiminished by governmental tax exactions other than war taxes.
The defendant seeks to avoid liability by a most insistent assertion that the plaintiff is in effect asserting a contention that an income tax was levied against the Eailroad Administration and the income derived by the Government from the *23 operation of the railroads. Whatever may be the defendant’s conception of the plaintiff’s argument, the very antithesis of this situation impresses us. Under the statutes defining the rights and liabilities of the parties a mutual right of contract was accorded. Whether the defendant gained or lost by the settlement was, with the exception of the provisions as to the test period as a basis of fixing compensation, a matter of negotiation and contract. When the contract was consummated the sum agreed upon became a governmental liability, a fixed and definite consideration payable to the railroad and obviously income of the railroad. When it became income of the railroad the revenue acts applied and liability for the income tax accrued. Therefore,, the only question involved is, under the terms of the law and the contract, which one of the parties assumed the payment of the tax. The statutes of 1918 and 1919 increasing income-tax rates clearly and unmistakably disclose that the 2 per cent normal-income tax herein claimed was not a war tax. The defendant so construed the legislation and acted consistently upon its own construction of the law.
Aside from all that has been said, the defendant in this case entered into a written contract of settlement with thee plaintiff. On July 1, 1921, the contract annexed to the petition was executed by the parties. Section 3 of this contract,, we repeat here by way of emphasis, provided: “ The settlement does not include the obligation of the director general assumed in paragraph (i) and (j) of section 4 of said standard contract to save the company harmless as to claims, if any, of third persons, or the obligations of the director general in respect to the payment of taxes under section 6-of the contract.” Section 6 of the standard form of contract expressly provided that the railroad was to be saved harmless from the payment of all Federal taxes except war taxes. It even extended the obligation to the payment of expenses, by the defendant, in the event of litigation respecting, the same. This contract was made under the authority given by section 202-203 of the transportation act off 1920, a statute extending, and in some respects, amplifying, the act of March 21, 1918, an act which accorded the right of contracting for the final adjustment of all claims of *24 the railroads, just compensation included, subsequent to the period of Federal control, a legislative grant of authority to the President to “adjust, settle, liquidate, and wind up all matters, including compensation, and all questions and disputes of whatsoever nature, arising out of or incident to Federal control.” The terms of this final agreement indicate ■an appreciation of the justness of the settlement, an intent of the Government to deal fairly with the ra.ilroad. During the whole period of Federal control the income derived from the •operation of the railroad was the property of the Government. The plaintiff had no right, title, or interest therein. Manifestly, it was not the intent of Congress to impose upon the income thus accruing to the Government an income tax which would be, in effect, but transferring the tax so levied from one pocket to another. Neither would it have been fair and equitable to levy against the railroads the normal peace time income tax assessable against funds paid to the railroad as just compensation, and thus diminish what was their due. ■Just compensation would not have been awarded by paying in one moment the sum agreed upon as such, and in the next ■retrieving a substantial portion thereof by way of taxation. The sum paid to this plaintiff as just compensation accrued to it during the period of Federal control; it was a right incident to and growing out of the period of Federal control ; it was inseparably annexed to the transaction of governmental operation of the railroad, formed a part of this particular period of time, and related to and was included within the laws respecting the reciprocal rights of the parties incident to the taking over of the railroads. It is a tax assessed against the revenues derived from operation, for that is the source of its accumulation. It may not be divorced from this transaction, although ascertained in amount and paid subsequent to the period of actual accumulation.
The purpose of the transportation act of 1920 was to enable the President to continue after, as he had been empowered previously, the negotiations and contracts for the settlement of liabilities accrued in virtue of the various statutes defining the rights of the parties during'the period ¡of Federal control. A task of such magnitude imposed by the law was not capable of complete settlement within the *25 limit of Federal control. The contract thus made follows without deviation the statutes which fixed the rights and liabilities of the parties, and recognizes without equivocation the legal obligation to make the railroad whole as to just compensation, and confirms the practice of the Railroad Administration and what was done under the laws. The obligations of the railroad respecting taxation during the period; of Federal control is what the statutes deal with. This was-the subject matter of the contract, and is what was settled by its terms, irrespective of the date. In our opinion, under both the law and the contract, the plaintiff is entitled to recover.
Judgment for plaintiffs in the sum of $21,295.62, with interest thereon as allowed by law. It is so ordered.
Graham, Judge; Hay, Judge; Downey, Judge; and; Campbell, Chief Justice, concur.